AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

17-6169-VALLE

United States of America
v.
Gary J. Boecker
*Defendant*

Case No. ~~5:17M 1099~~

## ARREST WARRANT

To: Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay *(name of person to be arrested)* Gary J. Boecker, who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment ☐ Superseding Indictment ☐ Information ☐ Superseding Information ☑ Complaint
☐ Probation Violation Petition ☐ Supervised Release Violation Petition ☐ Violation Notice ☐ Order of the Court

This offense is briefly described as follows:

18 U.S.C. § 1343, devising any scheme or artifice to defraud, to transmit or causes to be transmitted by means of wire in interstate or foreign commerce, any writings for the purpose of executing such scheme or artifice to defraud.

18 U.S.C. § 1344, knowingly executing, or attempting to execute, a scheme or artifice: (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by, or under the custody or control of, a financial institutions, by means of false or fraudulent pretenses, representations, or promises.

Date: 5/1/17

Kathleen B. Burke (signature)
*Issuing officer's signature*

City and state: Akron, Ohio

Kathleen B. Burke, US Magistrate Judge
*Printed name and title*

### Return

This warrant was received on *(date)* ________, and the person was arrested on *(date)* ________ at *(city and state)* ________.

Date: ________

*Arresting officer's signature*

*Printed name and title*

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

17-6169-VALLE

United States of America
v.

Gary J. Boecker
*Defendant(s)*

Case No. 5:17M 10..

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of 1/1/2014 to 5/31/2016 in the county of Summit in the Northern District of Ohio, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | devising any scheme or artifice to defraud, to transmit or causes to be transmitted by means of wire in interstate or foreign commerce, any writings for the purpose of executing such scheme or artifice to defraud. |
| 18 U.S.C. § 1344 | knowingly executing, or attempting to execute, a scheme or artifice: (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by, or under the custody or control of, a financial institutions, by means of false or fraudulent pretenses, representations, or promises. |

This criminal complaint is based on these facts:

see attached Affidavit, incorporated by reference.

☑ Continued on the attached sheet.

David Morgan
*Complainant's signature*

David P. Morgan - Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/1/17

Kathleen B. Burke
*Judge's signature*

City and state: Akron, Ohio

Kathleen B. Burke, US Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF COMPLAINT FOR ARREST WARRANT**

**INTRODUCTION**

I, David P. Morgan, being duly sworn and under oath state the following:

1. I am a Special Agent (SA) with the Federal Bureau of Investigation. I have been employed by the FBI since December of 1996. I am currently assigned to the Akron Resident Agency of the Cleveland Field Division.

2. As a Special Agent with the FBI, I investigate criminal matters related to White Collar Crime, Public Corruption, and Cyber Crimes including activities in violation of federal Wire Fraud, Mail Fraud and Bank Fraud statutes. Over the last twenty (20) years I have spent thirteen (13) years conducting investigations and seven (7) years supervising the conduct of investigations of all FBI criminal violations as well as national security violations.

**PURPOSE**

3. Based on the following, your Affiant has probable cause to believe that GARY BOECKER, date of birth: XX/XX/1953, devised a scheme to enrich himself and to fund a business venture located in Florida known as a "water therapy hotel," also known as Ocean Jade Health Retreat. While BOECKER overtly solicited some investments for his "water therapy hotel," possibly through the providing of false information, the focus of this Affidavit is the unauthorized diversion of funds to himself and to his "water therapy hotel" from entities that did not consent to invest nor had knowledge of the funding of that venture. As such, BOECKER devised a scheme to defraud entities, including financial institutions, and has transmitted data in interstate commerce in furtherance of that scheme in violation of 18 U.S.C. § 1343 (Fraud by Wire) and 18 U.S.C. § 1344 (Bank Fraud). This Affidavit is provided in support of a Criminal Complaint against BOECKER for that conduct.

4. The statements contained in this Affidavit are based in part on: information provided by FBI Special Agents; written reports about this and other investigations that I have received, directly or indirectly,

from other law enforcement agents, information gathered from the service of subpoenas; the results of physical and electronic surveillance conducted by law enforcement agents; independent investigation and analysis by FBI agents/analysts; and my experience, training and background as a Special Agent with the FBI. Because this Affidavit is being submitted for the limited purpose of supporting the requested Criminal Complaint, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested Complaint.

**RELEVANT STATUTES**

5. This investigation concerns violations of:

a. 18 U.S.C. § 1343 makes it a crime for anyone, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice to defraud.

b. 18 U.S.C. § 1344 prohibits a person from knowingly executing, or attempting to execute, a scheme or artifice: (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

**BACKGROUND**

**Ohio Disciplinary Counsel Related**

6. Prior to January of 2015, BOECKER was an attorney licensed to practice law in the State of Ohio. In addition to the practice of law, BOECKER also acted as a financial advisor to certain clients.

7. On December 19, 2014, the Ohio Disciplinary Counsel filed a complaint against BOECKER. According to the complaint, BOECKER was the trustee of the Cecilia Sears Living Trust (hereafter referred to as the CSL Trust) from 2002 to 2014. Between May, 2004 and March, 2006, BOECKER made four (4)

withdrawals of funds from the CLS Trust for his own use and benefit totaling approximately $58,000. Between October, 2010 and February, 2014, BOECKER made re-payments to the sole beneficiary of the trust, Mary Krebs. As a result of the filing of the Disciplinary Counsel's Complaint, BOECKER voluntarily forfeited his law license in January of 2015.

8. Later in 2015, the Ohio Disciplinary Counsel received notice of an overdraft status of BOECKER's IOLTA account identified as a First Merit bank account (account number ending in 1616) (hereafter referred to as IOLTA[1]). Casey Russo, Attorney for the Ohio Disciplinary Counsel, conducted a review of the IOLTA account and determined that, between February, 2015 and June, 2015, the account transacted approximately $600,000 in deposits, $472,000 in check withdrawals, and $90,000 in wire transfers from the account. Russo indicated that the account should have been closed in January of 2015.

9. From a review of account activity, Russo identified $400,000 in deposits originating from accounts under the control of Victim 1[2], who resides in Northern Ohio. Russo contacted Victim 1 who reported that she utilized BOECKER to manage her accounts to include personal accounts and a trust account. Victim 1 advised that she invested $200,000 with BOECKER originating from a family trust (hereafter referred to as Victim 1 Trust) and an additional $100,000 of her own money with BOECKER. Victim 1 advised that the monies were to be invested in a "water therapy hotel" located in Fort Lauderdale, Florida. Russo advised that although Victim 1 authorized the investment of a total of $300,000, BOECKER had actually caused withdrawals of at least $400,000 from Victim 1's accounts.

10. Affiant conducted a review of BOECKER's IOLTA account between the dates of February 1, 2015 and July 28, 2015. This analysis revealed that BOECKER is listed as the signer on the IOLTA account

[1] An IOLTA account is an attorney's trust account used to collect and disburse funds associated with a client. Deposits into an IOLTA account for a particular client will be associated with an equal value of debits associated with the client. In only very rare occasions would funds be moved from the trust account to accounts under the control of the attorney.

[2] Note that in all references to Victim 1's name, Victim 1's bank accounts, and trust accounts containing the name of Victim 1, the actual name of Victim 1 have been replaced by "Victim 1."

which is maintained at First Merit Bank, in Ohio. A review of the deposits into the account identified approximately $403,300 from Victim 1's accounts and deposits of $158,000 from Victim 2's company's accounts. These deposits were not able to be associated with withdrawals that would normally be expected in an IOLTA account. A significant portion of the disbursements from the IOLTA account were made to BOECKER or to entities in which he has/had a financial interest. The BOECKER related disbursements total $250,000 and are further described as follows:

| | | |
|---|---|---|
| a. | Airider[3] | **$1,800** |
| b. | BOECKER & Co[4] | **$14,500** |
| c. | CEO BrainTrust[5] | **$19,750** |
| d. | Checks to cash endorsed by BOECKER | **$20,000** |
| e. | GARY BOECKER | **$115,700** |
| f. | Sarah Holden[6] | **$900** |
| g. | Holden Total Wellness[8] | **$3,000** |
| h. | US Restore[7] | **$74,200** |

11. In addition, Affiant identified additional withdrawals from BOECKER's IOLTA account that may be related to a "water therapy hotel" in Florida totaling approximately $200,000. Of that amount, approximately $63,000 was executed via wire transfer. For instance:

---

[3] On August 16, 2013, BOECKER listed as Statutory Agent using the address 75 Milford Road, Suite 202, Hudson, OH, registered Airider USA, Inc, located at 4180 San Souci Court, Evergreen, CO.

[4] On June 3, 2015, BOECKER is listed as "Principal" for a company named BOECKER & Co., LTD, located at 2734 Sinton Place, Cleveland, OH.

[5] On February 17, 2012, BOECKER, acting as "Agent," incorporated a company named CEO BrainTrust, LLC, located at 75 Milford Drive, Suite 208, Hudson, OH.

[6] Sarah Holden, date of birth: XX/XX/1983, is the daughter of Gary BOECKER. On May 4, 2015, Sarah Holden registered Holden Total Wellness, LLC, located at 4553 North Ocean Drive, Fort Lauderdale, FL. Holden is also listed as the Manager of Holden Total Wellness as recent as January 20, 2016.

a. Between May 22, 2015 and July 23, 2015, $14,850 was transferred to Frank Sabatino. Sabatino, a resident of Florida, is known to be affiliated with Ocean Jade Health Retreat.

b. Between May 1, 2015 and July 3, 2015, $36,800 was transferred to Villa Aqualina, LLC. Villa Aqualina, LLC, 18401 Collins Ave, Sunny Isles Beach, FL 33160, is the previous owner of 4553 North Ocean Drive, Fort Lauderdale, FL, the current address of Ocean Jade Health Retreat.

**PROBABLE CAUSE – VICTIM 1**

**Investigation Related to Victim 1**

12. Victim 1 is described as an unmarried, 68 year old retired individual. According to Victim 1, since 1997 until approximately April 15, 2016, BOECKER managed Victim 1's personal bank and trust accounts located at Huntington Bank, ING Bank and Chase Bank. BOECKER was a close friend of Victim 1's family. Victim 1 treated BOECKER as a brother and had no reason to distrust him.

13. Victim 1 told your Affiant that on August 5, 2014, Victim 1 suffered a stroke and was in the hospital for four days. BOECKER visited Victim 1 while recuperating from the stroke and in a nursing home, and offered to take care of Victim 1's finances until Victim 1 recovered. Victim 1 agreed and signed a Power of Attorney Agreement to BOECKER so he could pay Victim 1's living expenses and expenses related to property Victim 1 owns in Streetsboro, Ohio. Victim 1 also provided BOECKER checkbooks and several pre-signed blank checks. Victim 1 did not authorize BOECKER to withdraw any funds from Victim 1 accounts for BOECKER's own use as he was providing this service as a friend.

14. Victim 1 told your Affiant that in early 2015, Victim 1 verbally agreed to invest $300,000 into BOECKER's "Ocean Jade" project which was described to Victim 1 as a "water therapy hotel" located in Florida. BOECKER told Victim 1 that five (5) individuals had already invested in the project and that there was only room for one more. BOECKER led Victim 1 to believe that the

---

[7] On August 5, 2013, BOECKER, listed as Statutory Agent using the address 75 Milford Road, Suite 202, Hudson, OH, registered US Restore, Inc, located at 5445 DTC Parkway, Suite 208, Greenwood, CO, and 75 Milford Road, Suite 202,

"Ocean Jade" project would generate a return on investment of 15% per year. BOECKER further told Victim 1 that he had life insurance policies on the "big wigs" associated with the project, thus Victim 1's investment was safe. Victim 1 was further led to believe that BOECKER owned the hotel involved with the project.

15. Throughout 2015 and into 2016, BOECKER gave Victim 1 at least five different opening dates for the "water therapy hotel." In January of 2016, Victim 1 visited the "water therapy hotel" located in Lauderdale-By-The-Sea, FL. Victim 1 observed that the hotel still needed a significant amount of work. Victim 1 specifically remembered seeing that appliances were not installed.

16. In 2016, Victim 1 discovered several unauthorized transactions from Victim 1 accounts, including evidence that BOECKER cashed in approximately $100,000 in Certificates of Deposit held by Victim 1. Although Victim 1 previously authorized the investment of $300,000, Victim 1 learned that BOECKER caused withdrawals of approximately $400,000 from Victim 1 accounts. In February of 2016, after the discovery of unauthorized account activity, Victim 1 asked BOECKER for the return of the checkbooks and bank statements.

17. On May 6, 2016, Victim 1 provided Affiant access to Victim 1's personal cellular telephone which contained data from dates April 12, 2012 to May 6, 2016. Within this data were text messages and call metadata for contacts between Victim 1 and BOECKER. A review of this data revealed the following:

    i. On August 31, 2015, at 9:43 AM, BOECKER sent the following text to Victim 1: "*I will be refunding to the trust, and to you, all monies that had been designated for 'Ocean Jade.' Only after Ocean Jade is compared, in all respects, to your other investments, and only after I, or someone else, actually drives you to Fla., for you to see all phases of the project first hand, will I then consider (but not the trust) designating any monies for this project (assuming you would still be in favor of doing so). In the meantime, I will provide*

---

Hudson, OH. Eric Valente is listed Assistant Secretary of US Restore, Inc.

*you with full refund, presumably within next 2 weeks. I apologize for what this has caused you to endure, and as such, I will proceed as stated.*" Victim 1 told Affiant that BOECKER never returned Victim 1's investment.

ii. On February 7, 2016, at 9:26 PM, Victim 1 sent the following text to BOECKER: "*I need to get trust money back from Jade project. I want a copy of the money u took from various accounts to transfer to trust account to fund Jade.*" (BOECKER did not reply to this text.)

iii. On February 16, 2016, at 9:14 AM, Victim 1 sent the following text to BOECKER: "*Need money. Home account is low. Need 3000 for payment to [Victim 1's sister] next week, need 1800 to finish paying for stain glass window for church, extra money for Trust account.*"

iv. On February 16, 2016, at 11:59 AM, BOECKER sent the following text to Victim 1: "*No worries; i will make the money you need available. I will call you later this afternoon or this evening to coordinate.*"

18. As of April 2017, Victim 1 has not received the return of Victim 1's investment nor the return of other debits initiated through BOECKER's unauthorized withdrawals.

**Expanded Analysis of BOECKER Controlled Financial Accounts**

**Transfers from Accounts Associated with Victim 1**

19. Beginning on June 7, 2016, your Affiant issued multiple Federal Grand Jury Subpoenas to financial institutions including First Merit Bank, Bank of America, J.P. Morgan Chase, Key Bank, and Capital One. The subpoenas requested account records related to accounts under the control of BOECKER. From the subpoena results, the following observations were made:

a. Account number ending in 7298 is a First Merit business checking account in the name of Airider. BOECKER and Richard King[8] are the only signers on this account. The account was

[8] Richard King is known to Affiant as a former Contract Employee for BOECKER who no longer has any authority

closed on January 29, 2016.

b. Account number ending in 1608 is a First Merit business checking account in the name of BOECKER & Co. BOECKER is the only signer on this account. The account was closed on July 28, 2015.

c. Account number ending in 7051 is a First Merit business checking account in the name of CEO BrainTrust. BOECKER is the only signer on this account. The account is currently open.

d. Account numbers ending in 6544 and ending in 5464 are associated with First Merit checking accounts in the name of BOECKER. BOECKER is the only signer on these accounts. These accounts are currently open.

e. Account number ending in 4813 is a First Merit business checking account in the name of US Restore. BOECKER and Richard King are the only signers on this account. The account was closed on August 12, 2015. When this account was closed, a negative balance existed in the account. The bank charged off a small loss associated with this account.

f. Account number ending in 1616 is associated with First Merit checking account in the name of BOECKER & Co LTD – IOLTA (mentioned previously).

20. A review of the account details for the above listed accounts between January 1, 2014 and May 31, 2016, revealed deposits from Victim 1 into accounts controlled by BOECKER. The following are the deposits of funds originating from accounts under the control of Victim 1. (Note that the below listed transactions are inclusive of transactions from BOECKER's IOLTA account discussed above as well as additional transactions. This is believed to be the total universe of funds transferred from Victim 1's account to BOECKER.):

---

over Becker related accounts.

| Receiving Acct. Bank / Acct # / Name | Originating Acct. Bank / Acct # / Name | Deposit Date | Amount |
|---|---|---|---|
| FM (ending in 8697) OJHR Holdings | HNB (ending in 8592) Named: Victim 1 / Victim 1's Sister | 3/26/15 | $50,000 |
| FM (ending in 8697) OJHR Holdings | HNB (ending in 2775) Named: Victim 1 | 3/27/15 | $50,000 |
| FM (ending in 8697) OJHR Holdings | ING (ending in 5557) Named: Victim 1 Living Trust | 6/8/15 | $4,500 |
| FM (ending in 1608) BOECKER & Co | Chase (ending in 3685) Named: Victim 1 Mother's Trust | 2/6/15 | $4,800 |
| FM (ending in 1608) BOECKER & Co | HNB (ending in 2330) Named: Victim 1 | 2/20/15 | $2,000 |
| FM (ending in 1608) BOECKER & Co | HNB (ending in 8592) Named: Victim 1 / Victim 1's Sister | 5/14/15 | $2,800 |
| FM (ending in 6544) Gary BOECKER - Atty At Law | All-State Policy #: ALL0222938 In the name of: Victim 1 | 9/23/14 | $67,075.98 |
| FM (ending in 6544) Gary BOECKER - Atty At Law | Gentry Enterprises Paid to the order of Victim 1 | 10/3/14 | $15,000 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | HNB (ending in 2330) Named: Victim 1 | 1/16/14 | $16,000 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | HNB (ending in 8592) Named: Victim 1 / Victim 1's Sister | 4/2/14 | $18,000 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | HNB (ending in 2775) Named: Victim 1 | 9/23/14 | $7,500 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | HNB (ending in 8592) Named: Victim 1 / Victim 1's Sister | 10/3/14 | $15,000 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | HNB (ending in 2330) Named: Victim 1 | 10/3/14 | $15,000 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | HNB (ending in 8592) Named: Victim 1 / Victim 1's Sister | 10/8/14 | $2,924.02 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | HNB (ending in 8592) Named: Victim 1 / Victim 1's Sister | 11/26/14 | $12,500 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | HNB (ending in 8592) Named: Victim 1 / Victim 1's Sister | 12/19/14 | $6,000 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | HNB (ending in 2330) Named: Victim 1 | 12/24/14 | $6,000 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | HNB (ending in 8592) Named: Victim 1 / Victim 1's Sister | 1/5/15 | $3,000 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | Chase (ending in 3685) Named: Victim 1 Mother's Trust | 2/6/15 | $50,000 |

| | | | |
|---|---|---|---|
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | Chase (ending in 3685)<br>Named: Victim 1 Mother's Trust | 3/5/15 | $40,000[9] |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | HNB (ending in 2775)<br>Named: Victim 1 | 3/10/15 | $4,800 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | Chase (ending in 3685)<br>Named: Victim 1 Mother's Trust | 3/10/15 | $35,000 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | HNB (ending in 2775)<br>Named: Victim 1 | 3/23/15 | $50,000 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | HNB (ending in 8592)<br>Named: Victim 1 / Victim 1's Sister | 3/27/15 | $50,000 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | ING (ending in 5557)<br>Named: Victim 1 Living Trust | 4/13/15 | $60,000 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | ING (ending in 5557)<br>Named: Victim 1 Living Trust | 4/14/15 | $50,000 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | ING (ending in 5557)<br>Named: Victim 1 Living Trust | 5/8/15 | $4,000 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | HNB (ending in 8592)<br>Named: Victim 1 / Victim 1's Sister | 5/11/15 | $4,000 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | HNB (ending in 1788)<br>Unknown | 5/11/15 | $4,500 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | ING (ending in 5557)<br>Named: Victim 1 Living Trust | 5/14/15 | $4,500 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | ING (ending in 5557)<br>Named: Victim 1 Living Trust | 5/14/15 | $25,500 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | HNB (ending in 1788)<br>Unknown | 5/21/15 | $4,500 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | ING (ending in 5557)<br>Named: Victim 1 Living Trust | 5/21/15 | $4,500 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | HNB (ending in 8592)<br>Named: Victim 1 / Victim 1's Sister | 5/22/15 | $4,800 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | HNB (ending in 8592)<br>Named: Victim 1 / Victim 1's Sister | 5/26/15 | $4,800 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | ING (ending in 5557)<br>Named: Victim 1 Living Trust | 6/2/15 | $4,500 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | HNB (ending in 8592)<br>Named: Victim 1 / Victim 1's Sister | 6/3/15 | $4,500 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | HNB (ending in 8592)<br>Named: Victim 1 / Victim 1's Sister | 6/8/15 | $4,800 |

[9] Once this check was deposited into BOECKER's account, it was returned NSF and the value deducted from the receiving account.

| | | | |
|---|---|---|---|
| FM (ending in 1616) BOECKER & Co (IOLTA) | ING (ending in 5557) Named: Victim 1 Living Trust | 6/8/15 | $4,800 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | HNB (ending in 8592) Named: Victim 1 / Victim 1's Sister | 6/9/15 | $4,800 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | HNB (ending in 8592) Named: Victim 1 / Victim 1's Sister | 6/10/15 | $4,500 |
| | | **Total** | **$726,900** |

21. Each of the above listed checks which are drawn on Victim 1's various accounts appear to have been signed in blank with another individual completing the payee and amount sections of the checks. The hand-writing of the payee and amount sections was similar to the hand-writing observed on other checks drawn on BOECKER accounts and signed by BOECKER. Victim 1 indicated that the hand-writing in the payee and amount sections is that of BOECKER.

22. A review of the aforementioned bank accounts also revealed fourteen (14) checks totaling $86,780 returned to Victim 1 or her sister between January 1, 2014 and May 31, 2016. This amount is inclusive of a NSF return of an attempted $40,000 deposit from Victim 1 Mother's Trust account on March 5, 2015.

23. Victim 1 has confirmed that, other than the $300,000 investment in the "water therapy hotel," Victim 1 did not authorize and was not aware of the above listed withdrawals from accounts under Victim 1's control.

**<u>Recent Contact between BOECKER and Victim 1</u>**

24. Since approximately the middle of 2015, Richard King[8] has worked with Victim 1 in order to determine the total amount of unauthorized withdrawals made by BOECKER and has attempted to recoup some of those losses. In July of 2016, BOECKER provided King a draft Promissory Note, purported to have been created by BOECKER's attorney, which indicated that "*BOECKER... promises to pay to the order of* [Victim 1] *the principal sum of*_______ *(the "Indebtedness")*". Within this draft Promissory Note, the date of the Note, principal sum, payment amount, and signature is blank. In Section 5 of the

Promissory Note, BOECKER proposed to provide Victim 1 a Collateral Assignment Agreement[10] which would assign "*100% of the first $600,000 of the Collateral Assignment's referenced Pacific Life Policy Death Benefit, of which the Maker* [BOECKER] *is the Policyowner* (sic)". King told Affiant that he understood this "collateral assignment" to be that Victim 1 was to be listed as the beneficiary of the first $600,000 of life insurance to be paid upon the death of BOECKER.

25. On September 23, 2016, after several conversations between BOECKER and King to determine the total amount of "Indebtedness" referenced above, BOECKER emailed King a schedule of monies taken from Victim 1 and repayments made to Victim 1 and Victim 1's sister. The following are details of that email:

a. Portion of email text: *"Attached please find the latest updated version of disbursements and payments re: the* [Victim 1] *Living Trust..."*

b. Attachment to the email: "[Victim 1] *Living Trust – Account Compilation (as of 9-23-16).*"

i. Withdrawals from Victim 1:

| | | |
|---|---|---|
| 1. | Victim 1 Living Trust (Account ending 8592) | $168,424 |
| 2. | Victim 1 Living Trust (Account ending 3685) | $89,800 |
| 3. | Victim 1 Living Trust (Account ending 5557) | $132,300 |
| 4. | Total | $390,524 |

ii. Re-payments made to Victim 1 or Victim 1's sister $70,885

iii. "*Total Balance Due* [Victim 1] *Living Trust*" is $319,639.

[10] Affiant does not have a copy of this Collateral Assignment Agreement.

**PROBABLE CAUSE - VICTIM 2**

**Investigation Related to Victim 2**

26. On September 9, 2016, Victim 2, owner of Victim 2's company[11], indicated that he became acquainted with BOECKER in 1993. At that time Victim 2 acquired an $800,000 term life insurance policy from Minnesota Life. BOECKER was the attorney who assisted Victim 2 in placing the annuity in a trust. Victim 2 and BOECKER developed a good relationship and later in 1993 Victim 2 asked BOECKER to become a consultant and member of Victim 2's company's Board of Directors.

27. Victim 2 also advised that in approximately 2005, BOECKER became an employee of Victim 2's company and was placed in charge of the financial aspects of the company including all banking relationships.

28. In July 2015, BOECKER told Victim 2 that he was retiring from his law practice. Victim 2 later learned that BOECKER told another employee of Victim 2's company in January of 2015 that BOECKER was having heart problems and needed to retire from his law practice. BOECKER told this other employee not to tell Victim 2. BOECKER never told Victim 2 that he lost his law license.

29. Also in 2015, BOECKER asked Victim 2 for a personal loan. Victim 2 agreed to provide BOECKER a personal loan in the amount of $238,000 to be repaid within 60 days. At the time of the loan, BOECKER made no indication that he had previously taken funds from Victim 2 or from Victim 2's company. After Victim 2 agreed to provide Boecker the personal loan, Victim 2 assumed that BOECKER effected the transfer of funds for the loan.

30. In August of 2015, Victim 2 told BOECKER that BOECKER needed to generate a Promissory Note to document the personal loan. On August 25, 2015, BOECKER provided Victim 2 with a Promissory Note in the amount of $279,300. Victim 2 noticed the $40,000 increase in the loan amount but did not

---

[11] Note that in all references to Victim 2's name, Victim 2's bank accounts, and Victim 2's company, the actual name of Victim 2 have been replaced by "Victim 2." All references to References to Victim 2's company are

"think too much about it" as Victim 2 "trusted BOECKER and believed that the entire amount would be repaid with 60 days." The Promissory Note is signed by BOECKER and, in paragraph 5, the Promissory Note indicates "*Maker (BOECKER) specifically provided, as and for specific collateral for the herein promissory note, as much of Maker's stock in Victim 2's company as is necessary to satisfy the obligation of the Maker...*"

31. In March of 2016, Victim 2 learned that BOECKER obtained a loan from First Merit Bank in the name of Victim 2's company in the amount of $296,400 dated November 19, 2015 (see paragraph 31). The loan was taken out without Victim 2 or any other Victim 2's company employee's knowledge even though Victim 2 and other employee's signatures appear throughout the paperwork. Victim 2 advised not only did he not sign the loan documents but the bank did not require co-signers to present themselves at the bank in person to sign the loan documents. The loan proceeds of $296,400 were provided to BOECKER in the form of a Cashier's Check. Victim 2 contacted First Merit Bank to obtain the original loan agreement detailing the forged signatures. First Merit Bank told Victim 2 the original loan documents had been misplaced and they provided Victim 2 a copy for his records.

32. In late March of 2016, Victim 2 learned that BOECKER had lost his law license. Subsequently, Victim 2 terminated BOECKER's employment in June of 2016.

33. A review of the previously mentioned BOECKER accounts indicated deposits from Victim 2's company into accounts controlled by BOECKER. The following are the deposits from Victim 2's company accounts and the deposit of checks resulting from the loan issued to Victim 2's company:

| **Receiving Acct. Bank / Acct # / Name** | **Originating Acct. Bank / Acct # / Name** | **Deposit Date** | **Amount** |
|---|---|---|---|
| FM (ending in 1608) BOECKER & Co | FM (ending in 9509) Victim 2's company | 1/16/14 | $24,000 |
| FM (ending in 1616) BOECKER & Co (IOLTA) | FM (ending in 9509) Victim 2's company | 8/19/14 | $48,000 |
| FM (ending in 1616) | FM (ending in 9509) | 9/12/14 | $48,000 |

inclusive of all subsidiaries of Victim 2's company.

| | | | |
|---|---|---|---|
| BOECKER & Co (IOLTA) | Victim 2's company | | |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | FM (ending in 9509)<br>Victim 2's company | 9/23/14 | $58,000 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | FM (ending in 9509)<br>Victim 2's company | 10/14/14 | $48,600 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | FM (ending in 9509)<br>Victim 2's company | 5/27/15 | $8,500 |
| FM (ending in 1616)<br>BOECKER & Co (IOLTA) | FM (ending in 9509)<br>Victim 2's company | 6/17/15 | $150,000 |
| FM (ending in 8697)<br>OJHR Holdings | FM (ending in 9509)<br>Victim 2's company | 8/10/15 | $6,000 |
| FM (ending in 8697)<br>OJHR Holdings | FM (ending in 9509)<br>Victim 2's company | 8/18/15 | $78,000 |
| FM (ending in 6544)<br>Gary BOECKER - Attorney At Law | FM (ending in 9509)<br>Victim 2's company | 9/23/15 | $10,000 |
| FM (ending in 8697)<br>OJHR Holdings | FM (ending in 9509)<br>Victim 2's company | 10/6/15 | $41,300 |
| FM (ending in 7051)<br>CEO BrainTrust | FM (ending in 9509)<br>Victim 2's company | 11/9/15 | $2,500 |
| FM (ending in 7051)<br>CEO BrainTrust | FM (ending in 9509)<br>Victim 2's company | 2/2/16 | $5,000 |
| FM (ending in 7051)<br>CEO BrainTrust | FM (ending in 9509)<br>Victim 2's company | 2/4/16 | $2,000 |
| FM (ending in 7051)<br>CEO BrainTrust | FM (ending in 9509)<br>Victim 2's company | 3/1/16 | $3,200 |
| FM (ending in 7051)<br>CEO BrainTrust | FM (ending in 9509)<br>Victim 2's company | 4/4/16 | $3,200 |
| | | **Total** | **$536,300** |

**Investigation Related to First Merit Bank's Loan to Victim 2's company**

34. From an email located by Lythowski & Co, a Certified Public Accountant firm hired to perform a forensic audit for Victim 2's company, on August 17, 2015, BOECKER emailed Liz Legler, relationship manager at First Merit Bank, "*in my capacity as CEO of* Victim 2's company, *I would like to move forward with a request for financing from First Merit for purposes of 1-3 existing Shareholders selling their shares of stock in* Victim 2's company *to the corporation...*"

35. On November 19, 2015, First Merit Bank issued a $296,400 loan to Victim 2's company. From a review of the documents, the loan officer was Liz Legler and the purpose of the loan was "to buyout other

owners of Victim 2's company." In spite of the fact that the borrower was listed as Victim 2's company and in spite of the stated purpose, the proceeds of the loan were made to BOECKER via a $296,400 Cashier's Check dated November 20, 2015.

36. A review of BOECKER's bank accounts revealed that on November 20, 2015 the loan proceeds were deposited to the BOECKER's First Merit account for CEO BrainTrust (account number ending in 7051). A review of the CEO BrainTrust account revealed that between November 9, 2015 and March 31, 2016, no withdrawals were made to Victim 2's company or to "other owners of Victim 2's company." The balance in the CEO BrainTrust account prior to the deposit of the loan proceeds was approximately $790. The following is a summary of debits from the CEO BrainTrust account after November 20, 2015:

   a. Over $110,000 in debits were made to accounts under the control of BOECKER

   b. Over $173,000 in debits were made to the account for OJHR Holdings Corp[12] (account number ending in 8697), also under the control of BOECKER.

37. First Merit, now known as Huntington Bank, is known to be a financial institution insured by the Federal Deposit Insurance Corporation.

**<u>Investigation Related to Misuse of Victim 2's Company Credit Card</u>**

38. According to Victim 2 and Victim 2's company employees, while employed at Victim 2's company, BOECKER was issued a corporate American Express credit card (account ending in 7-51222). This credit card was to be used exclusively for expenses related to Victim 2's company.

39. Routinely, Victim 2's company employees, who were under the supervision of BOECKER, would receive detailed credit card statements for the corporate credit card which would include detailed charges made by BOECKER. As these employees reviewed the credit card statement, often they noticed charges

---

[12] Your Affiant believes that OJHR Holdings Corp was primarily used to fund the "water therapy hotel" know also as Ocean Jade Health Retreat.

that did not appear to be business related. On those occasions, these employees copied BOECKER's credit card statement, highlighted the questionable charges, and provided the copy to BOECKER with a note asking BOECKER if the charges were related to the business. BOECKER never responded to these questions from his subordinates. The employees told Affiant that BOECKER made it clear to his subordinates that Victim 2 did not want to be bothered with questions about company finances.

40. The employees reviewing the credit card statements told Affiant that on one occasion, one of the employees told Victim 2 about the non-business related charges. Victim 2 told the employee that he would take care of the issue. Later, BOECKER made repayment of approximately $1,000 to the company.

41. Your Affiant conducted a review of BOECKER's corporate credit card charges between January 10, 2014 and February 19, 2016, and identified numerous instances of charges that do not appear to be business related. Victim 2 and Victim 2's company employees have identified that the following charges are not business related, were caused by BOECKER, and were ultimately paid by Victim 2's company:

| | | |
|---|---|---|
| a. | Flights to Ft. Lauderdale | $17,474.43 |
| b. | Rental cars in the Ft. Lauderdale area | $2,723.33 |
| c. | Flights for individuals not employed by Victim 2's company | |
| i. | Abigail Boecker | $994.40 |
| ii. | Daniel Rozboril | $993.00 |
| iii. | David Wayne Fox | $603.00 |
| iv. | Richard King | $794.20 |
| v. | Sarah Holden | $502.20 |
| vi. | Theodore Boecker | $189.96 |
| | **Total** | **$24,274.52** |

42. When Victim 2 was shown the totality of BOECKER's non-business related charges, Victim 2 indicated that he was not aware of the extent of BOECKER's charges.

43. On April 24, 2017, American Express Investigative Assistant Lenora Echeveste provided information detailing that all point of sale charges for American Express credit cards are electronically processed though Phoenix, AZ. Therefore, any charge not initiated in Arizona will generate an electronic, interstate wire communication.

**CONCLUSION**

44. Based on the information provided above, your Affiant believes the facts support that there is probable cause to believe that GARY BOECKER, date of birth: XX/XX/1953, devised a scheme to defraud Victim 1, Victim 2, Victim 2's company, and First Merit Bank, in violation of 18 U.S.C. § 1343 (Fraud by Wire) and 18 U.S.C. § 1344 (Bank Fraud), respectively, by providing false and fraudulent information and abusing the position of trust he generated with those entities.

45. There is further probable cause to believe that in furtherance of BOECKER's scheme, BOECKER caused 1) interstate wire transfers to occur from banks located in the Ohio area to banks in the Ft. Lauderdale, FL, area, and 2) interstate wire communication to occur from American Express credit card point of sale locations to Phoenix, AZ.

Special Agent David P. Morgan
Federal Bureau of Investigation

Sworn to me on 5/1/17.

Kathleen B. Burke
United States Magistrate Judge